Filed 9/17/24  In re T.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.N., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082446 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2200126) |
| v. | OPINION |
| K.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

K.A. (mother) appeals from orders terminating her reunification services. She argues the Riverside County Department of Public Social Services (department) failed to provide reasonable reunification services. Relatedly, she argues the department violated the Indian Child Welfare Act (ICWA) by failing to make active efforts to prevent the breakup of an Indian family. The department argues it provided reasonable reunification services. It also argues the ICWA active efforts duty does not apply here because, although the child is apparently eligible for membership in a tribe, he is not yet enrolled and therefore is not yet an Indian child. We conclude there is substantial evidence the department provided reasonable reunification services. The juvenile court has not yet made any ruling on whether the department made active efforts to prevent the breakup of an Indian family, so that issue is not ripe.

## BACKGROUND

This dependency concerns mother's minor child T.N. (born 2021).

In October 2022 the department received a referral alleging the parents neglected T.N. and engaged in domestic violence. Specifically, the referral alleged that mother attacked father with a butter knife, that she seemed paranoid, that she was distressed and panicked whenever T.N. cried, and that she generally suffered from mental health issues. The parents also allegedly "had a history of domestic violence with law enforcement involvement."

The department visited the parents' home and spoke to father. Father told the department mother had a diagnosis of schizophrenia, depression, and anxiety. He said

2

she was supposed to take medication, but had not done so for almost two months. He also said there were a dozen similar domestic violence incidents in the past. However, father said mother was never violent towards T.N. He said that he considered leaving mother and taking T.N. but felt he could not do so because mother was not capable of caring for herself.

Mother confirmed she was no longer taking her medication. The department also reported that she had a history of abusing controlled substances such as alcohol and marijuana, and was volatile while under the influence of alcohol. Mother was also involuntarily committed under Welfare and Institutions Code section 5150[1] shortly after T.N.'s birth.

The department removed T.N. via a protective custody warrant, and filed a petition under section 300, subdivision (b)(1). The petition alleged the parents had a history of domestic violence, mother suffers from unresolved mental health issues, mother had a history of substance abuse and volatile behavior while under the influence, and father had a history of marijuana abuse.

Shortly thereafter, mother informed the court and the department that T.N. may be a member of, or eligible for membership in, the Oklahoma Cherokee tribe.

At the detention hearing, the court found the petition stated a prima facie case for all allegations except the substance abuse allegation against father, and detained T.N. The court asked both parents about their Indian ancestry, and both mother and mother's

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

3

counsel informed the court that maternal great-grandmother is a registered member of the Cherokee tribe. Accordingly, the court found there was reason to believe T.N. is an Indian child. The department subsequently followed up with the maternal grandmother, who confirmed she was a registered member of a tribe.

The department interviewed the parents again before the jurisdiction and disposition hearing. Mother admitted to domestic violence incidents, including one incident in 2015 where she stabbed father "partly on the neck, leg, and hand with a large knife," which resulted in her arrest. She also admitted to trying to stab father with a butter knife in the most recent domestic violence incident. Mother said she completed high school and some community college. She was unemployed and waiting to be approved for disability. Mother told the department "she did not feel capable of caring for the child, and wanted the father to reunite and keep the child, until she figures out her life." However, she did not agree to relinquish T.N. She also told the department she suffered from post-traumatic stress disorder and depression.

Father elaborated on mother's struggles with her mental health and other cognitive issues. He said he removed the TV from their home because she thought people were watching her through it, and that she stopped eating food he cooked because she thought he poisoned it. He also alleged that she has a learning disability and "[s]he can't count, she can't read, [and] she can't keep track of time." According to father, mother did not graduate high school until she was 21. He said her mental health got worse after T.N.'s

4

birth, and that he can no longer take care of both her and T.N. He also expressed frustration that she would not engage in parenting classes.

The department referred mother to domestic violence for perpetrators classes, substance abuse services, individual therapy, and parenting education. It also provided a referral for a parent partner.

The court held an initial jurisdiction hearing in November 2022. However, it found exceptional circumstances to continue it to allow for further ICWA inquiry and noticing. Accordingly, the court ordered the department to send ICWA notices to the Bureau of Indian Affairs (BIA). It also authorized a psychological evaluation for mother.

In December 2022 the Cherokee Nation responded to the department's notice. It informed the department that T.N. "can be traced in our tribal records based on the extended family member/s highlighted above." It advised that T.N. was not currently an Indian child, and that the tribe therefore did not have jurisdiction to intervene. However, it included information for how to enroll T.N. in the tribe. The department provided the enrollment information to mother. Mother informed the department she already had an enrollment packet, but the packet she showed the department was unrelated to tribal enrollment. The department then "offered assistance for the child's enrollment." To assist, the department contacted the Eligibility Supervisor for the Cherokee Nation, who confirmed T.N. was eligible for membership through the maternal grandmother.

The court held a continued jurisdiction hearing in December 2022. At this jurisdiction hearing minor's counsel requested additional help getting T.N. enrolled with

the tribe. Mother's counsel told the court that mother planned to enroll as well, and also requested the department's help. Mother also requested a parent partner. The court continued the jurisdiction hearing so the parties and the department could pursue enrollment. To that end, the court ordered the department to assist T.N. and mother in enrolling themselves with the tribe, and advised counsel for both parties that they should be assisting their clients as well. The court also ordered the department to provide mother with a parent partner and referrals for domestic violence programs. The department provided a referral for a parent partner about three weeks later.

The same day as the jurisdiction hearing, father called the department "on behalf of the mother to 'advocate for her.' " Mother was present during the call. Father reported that mother felt "lost and overwhelmed" by the process, that she had been dropped from her parenting class, that she did not understand what happened in court, and was " 'forgetful.' " He said mother was not able to complete services concurrently, and needed to do them one at a time. Mother also requested that she no longer be required to participate in substance abuse classes, because she only used marijuana. The department advised mother that she could complete her services one at a time, but that would mean the reunification process would take longer. Mother told the department she would re-enroll in parenting classes, enroll in domestic violence services, and continue substance abuse treatment.

In January 2023 mother told the department she tried to contact the Cherokee tribe but did not succeed. She also said her attorney was not helping her with the enrollment

6

process. The department re-sent the tribe's contact information, and "once again offered the mother assistance for the enrollment if needed." Mother told the department she would update them when she started the process and contact them if she needed help.

The court held another jurisdiction hearing in January 2023. Mother's counsel reported he was having issues assisting mother with enrollment because the tribe was "creating a lot of roadblocks." He "finally came to the conclusion that it's just going to be easier for mother to ask for the documents," and that mother had done so. However, he could not say how long it would take to finally get mother enrolled. The court continued the jurisdiction hearing again to allow mother to enroll in the tribe. Later that month, mother told the department she completed the paperwork to enroll herself and T.N. in the tribe.

As of February 2023 mother was attending parenting classes, substance abuse classes, and domestic violence services. Father had completed his domestic violence services.

The court held another jurisdiction hearing that same month. The court sustained the petition, detained T.N., and ordered reunification services. The court added medication reviews to mother's case plan, and authorized a psychological evaluation over mother's objection. It is uncontested mother never received this psychological evaluation. As to ICWA, the minute order indicates the court found T.N. may have Indian ancestry, that there was reason to know T.N. is an Indian child, and that ICWA may apply.

The court held a six-month review hearing in August 2023. At the hearing the court ordered the department to provide a referral for a parent partner. Mother's counsel informed the court that the Cherokee Nation had the relevant enrollment paperwork, but the parties had not heard back from them.

In September 2023 mother told the department that the tribe had informed her she needed to turn in paperwork to continue the enrollment process, but mother could not identify what paperwork that was. The department attempted to call the tribe on mother's behalf, but the call went to voicemail. The department then "encouraged [mother] to continue to call, and to email the tribe using the contact information" it had previously provided.

The department filed a report in September 2023 recommending the court terminate mother's reunification services. Mother barely participated in services. She completed only one month of parenting education and domestic violence services before dropping out, only one session of individual therapy, and tested positive for marijuana multiple times before dropping out of the substance abuse program because "she stated she was unable to remain sober." Mother was living on an air mattress in maternal grandmother's mobile home, and told the department that she wanted to enter a residential treatment facility to have shelter and receive a higher level of care regarding her issues with marijuana. The department helped mother call a number they provided to inquire about residential treatment facilities, but mother admitted she did not complete the call because the representative was " 'rude.' " In general mother expressed feeling

8

overwhelmed and that she wanted to enter residential treatment of some kind, but was not able or willing to do the work necessary to enter such treatment.

The court held another six-month review hearing in September 2023. At that hearing mother's counsel reported that they still had not heard back from the Cherokee Nation. According to counsel mother had filed all necessary paperwork but the tribe had a "backlog" and had not yet processed the paperwork. The court set a contested six-month review hearing for the next month.

At the contested six-month review hearing held in October 2023, mother's counsel informed the court that mother was in a residential treatment facility in Yucaipa. Mother was medication compliant in the facility. Mother's counsel also requested "an authorization to assist mother with the Cherokee Nation." According to mother's counsel the tribe needed a long form birth certificate for T.N., which mother struggled getting. The department did not object to this request. The court stated that it "already made orders with regard to providing [mother] with assistance, as that's required under the law . . . for the Department to assist." It therefore maintained that order.

Nevertheless, the court ultimately found mother had made minimal progress in her case plan. Accordingly, the court continued T.N. in detention, continued reunification services for father, but terminated reunification services for mother. In doing so it found "[b]y clear and convincing evidence, [mother] failed to participate regularly and make substantive progress in a court-ordered treatment plan and there is no substantial

9

probability that the child . . . will be returned."  It also found "there's reason to know that [T.N.] may be of Native American ancestry."  Mother appealed.

ANALYSIS

Mother makes two interrelated arguments.  First, she argues the department and court did not provide her with reasonable reunification services.  Second, she argues the department did not make active efforts to prevent the breakup of an Indian family in violation of ICWA, in part by failing to provide sufficient reunification services.  The department argues it did provide reasonable reunification services, and that ICWA does not apply because T.N. is not yet an Indian child.[2]

Under both state and federal law, when the court knows a child is an Indian child, it must find the department made active efforts to prevent the breakup of the family before either placing the child in foster care or terminating parental rights.  (§ 361.7,

---

[2] The department also argues mother forfeited any ICWA error.  Because we conclude mother raises these ICWA issues prematurely, we do not address the department's forfeiture argument.

We also note that under section 224.2, subdivision (h), whether a child is a member of a tribe or eligible for membership is governed entirely by the tribe, and "[i]nformation that the child is not enrolled, or is not eligible for enrollment in, the tribe is not determinative of the child's membership status unless the tribe also confirms in writing that enrollment is a prerequisite for membership under tribal law or custom." (§ 224.2, subd. (h).)  Here the Cherokee Nation has stated in writing that T.N. is not an Indian child—and therefore not a member of the tribe—because he is not enrolled as a tribal citizen, but the department and the juvenile courts should keep in mind that no tribe needs such a rule, and a child may be a member of a tribe without going through any enrollment process.

10

subd. (a); 25 U.S.C. § 1912(d).)[3] Furthermore, under California law, the department and the court are obligated to treat a child as an Indian child even if they do not *know* the child is an Indian child, but there is *reason to know* the child is an Indian child. (§ 224.2, subd. (i)(1); Cal. Rules of Court, rule 5.481(b)(3).)

The department argues the trial court never found that there was reason to know T.N. was an Indian child, and therefore they were never required to treat him as if he were an Indian child. This is simply not true. The trial court arguably found there was reason to know T.N. is an Indian child twice—in a February 2023 minute order and orally at the October 2023 contested six-month review hearing when it "note[d], as has been stated on the record, there's reason to know that [T.N.] may be of Native American ancestry."

Nevertheless, the department urges us to ignore, reject, or reinterpret these findings. Specifically, it argues the trial court's February 2023 minute order—which expressly found there was reason to know T.N. may be an Indian child—is erroneous, because the court did not make this finding orally. It also argues the court's later oral finding that "there's reason to know that [T.N.] may be *of Native American ancestry*," is not a finding that there was reason to know T.N. *is an Indian child*. (Italics added.)

---

[3] Active efforts are defined under section 224.1, subdivision (f), as generally "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with their family." Section 224.1, subdivision (f), also lays out a detailed, non-exhaustive list of actions which would fall under the umbrella of active efforts, and which generally include actively assisting the Indian family in interfacing and receiving certain remedial services, as well as requiring the court and department to include and coordinate with the relevant tribe or tribes throughout the proceedings.

Neither of these arguments is at all convincing. First, there is no contradiction between the court's oral findings and the February 2023 minute order. The court stated orally that it "adopt[ed] the findings and orders recommended by the Department that are attached to the jurisdiction/disposition report." These recommendations—which the department itself made—included a recommended finding that "[t]he child is an Indian child or there is reason to know that the child is an Indian child." The department cannot invite the court to make such a finding, accept its oral adoption of related findings, but nevertheless claim that because it did not orally recite this specific finding the minute order contradicts the oral pronouncement.

Nor was the court's oral finding at the October 2023 hearing ambiguous, or otherwise insufficient. There is no way to interpret the court's finding that there was reason to know T.N. had Native American ancestry as anything other than a finding that there was reason to know he is an Indian child, even if the court did not use that exact phrasing.

Finally, the court's full oral pronouncement at the October 2023 hearing shows that it intended to find there was reason to know T.N. is an Indian child at both the February and October hearings. At the October hearing the court "note[d], as has been stated on the record, there's reason to know that [T.N.] may be of Native American ancestry." Thus, the court believed it had made a "reason to know" finding and was simply reaffirming that earlier finding. This suggests, if not outright proves, that the

12

court intended its "reason to know" finding in the February 2023 minute order, and that the October oral pronouncement was meant to mirror that earlier finding.[4]

Thus, we reject the department's contention that it was not obligated to make active efforts to prevent the breakup of the Indian family. Though T.N. is not yet an Indian child, the court's "reason to know" finding meant the court and the department needed to treat him as if he were one until the court determined otherwise.

Nevertheless, we conclude that mother's ICWA arguments are premature. At the time the court detained T.N. and placed him in foster care, it only had reason to believe, and not reason to know, T.N. may be an Indian child. Therefore the court was not required to, and did not, find the department made "active efforts" under section 361.7 at that time. The next time the court will need to make an active efforts finding is not until a party seeks to terminate mother's parental rights. That finding, or lack thereof, will be reviewable then. The issue is not, however, ripe for review now.

We turn, then, to mother's argument that the department failed to provide reasonable reunification services. When a court orders reunification services, the department must ensure the services provided are reasonable. (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501 (*Earl L.*).) Whether the

---

[4] There does appear to be a discrepancy between the court's minute orders and its oral pronouncements, but not in the department's favor. The October 2023 minute order following the six-month review hearing states, "[t]here is reason to believe that the child . . . may be of Indian ancestry." This statement contains two errors. First, it misstates the court's oral pronouncement that "there's reason to *know* that [T.N.] may be of Native American ancestry." (Italics added.) Second, it echoes the court's misstatement by referencing whether he had Native American ancestry rather than whether he was an Indian child.

reunification services offered were reasonable and suitable is judged according to the circumstances. (*Earl L.*, at p. 1501.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Any reunification plan "must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)

The court's reasonable services finding "must be made by clear and convincing evidence in the trial court." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.) We review the finding that reasonable services had been provided or offered for substantial evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) In other words, "the question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id.* at p. 1009.)

14

On this deferential standard of review, we have no appropriate basis to disturb the juvenile court's finding that the department provided reasonable reunification services. Mother argues that, given her cognitive and mental health issues, the department had to provide more help obtaining services. But there is sufficient evidence in the record that mother's issues were not with obtaining services but participating in them. The examples of her beginning services, but not following through, are replete. She completed one month of parenting education and domestic violence services before dropping out, and her attendance during that month was spotty. She attended only one individual therapy session. She tested positive for marijuana multiple times before withdrawing from substance abuse services altogether because she admitted she was unable to remain sober. When mother expressed a desire to enter residential treatment, the department helped her call a facility, but she ended the call early because she felt the representative was rude. All of these are not examples of mother failing to engage with services at all but of her failing to *continue* with services once started and her failure to capitalize on what help the department did offer. Even if we agreed the department had a duty to help mother obtain services, it cannot make her participate in them.

Mother argues the department's failures to assist her in obtaining a parent partner, and its failure to provide her with a court authorized psychological evaluation, mean she was not provided reasonable reunification services. We disagree. As the department points out, it made two referrals for mother to get a parent partner, and mother simply failed to take advantage of those referrals. And though we agree with mother that the

15

department should have provided her the psychological evaluation the court authorized, we cannot say its failure to do so undermines the court's finding that the services it did provide were reasonable. Indeed, mother's counsel argued he did "not see the purpose of doing the psychological evaluation when mother is already in her mental health services." Instead, he "urge[d] the Department to work with mother's current mental health team," who had been "treating mother since 2019, including the issues that were outlined in the detention report." Though the court was apparently unconvinced by this argument at the time, since it did authorize a psychological evaluation, seeing mother's general failure to engage with services might have changed its mind. In other words, even if we agree with mother that the department should have given her a psychological evaluation, there was nevertheless sufficient evidence for the court to conclude that such an evaluation was unnecessary and/or would not have been helpful, for the reasons mother's counsel articulated.

Accordingly, we conclude that substantial evidence supports the trial court's implicit finding that the department provided reasonable reunification services, and therefore affirm its order terminating reunification services.

DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:


RAMIREZ _____
P. J.

MILLER _____
J.

17